

# TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

October 22, 2021

Charles E. Blau, Esq.
Daniel R. Kanoff, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

Daniel J. Pollak, Esq.
Brach Eichler, LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068

> Re:  West Orange Plaza
> <u>v. West Orange Township</u>
> Docket Nos. 005184-2014, 001416-2015, 006603-2016,
> 001274-2017, 004505-2018, and 001137-2019

Dear Mr. Blau, Mr. Kanoff, and Mr. Pollak:

This letter constitutes the court's opinion following trial of the local property tax appeals filed by plaintiff, West Orange Plaza ("Plaza"). Plaza challenges the 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments on its improved property located in West Orange Township ("West Orange").

For the reasons stated more fully below, the court reduces the 2014, 2015, 2016, 2017, 2018, and 2019 local property tax assessments.

## I.  Procedural History and Factual Findings

Pursuant to <u>R.</u> 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony offered during trial.






As of each valuation date, Plaza was the owner of the property located at 189 Prospect Avenue, West Orange Township, Essex County, New Jersey (the "subject property"). The subject property is located on the Northwest corner of the intersection of Prospect Avenue and Eagle Rock Avenue in West Orange; and is identified on West Orange's municipal tax map as Block 152.01, Lots 1445 and 1445.05.[1]

The subject property comprises approximately 32.319 acres, divided between two separate tax lots.[2] Together, the lots are "L" shaped, containing approximately 1,309 feet of frontage along Prospect Avenue, 653 feet of frontage along Eagle Rock Avenue, and 400 feet of frontage along Terrace Avenue.

As of each valuation date at issue, the subject property was improved with a three-tiered community shopping center, built in or about 1965, and two single-tenanted detached retail outbuildings, commonly known as West Orange Plaza.[3] The lot's topography is generally level

---

[1] The subject property was formerly identified on West Orange's municipal tax map as Block 152.24, Lots 1445 and 1445.05.

[2] During trial, Plaza offered testimony that the subject property is 32.319 acres, and West Orange offered testimony that the subject property is 32.7528 acres. The court finds the lot size difference is *de minimus* and immaterial to the court's conclusions of value in these matters.

[3] Categorization of the subject property as a community shopping center or as a strip/neighborhood center was disputed during trial. Plaza's expert characterized the subject property as a "strip center" or neighborhood center (which he opined were interchangeable terms), while West Orange's expert characterized it as a community shopping center. Generally, a community shopping center "reflects a general merchandise or convenience concept and typically encompasses 100,000 to 350,000 square feet of gross leasable area, including anchors, on 10 to 40 acres. A community shopping center will typically have two or more anchors (discount department, supermarket, drug, home improvement, large specialty discount) with a 40% to 60% anchor ratio (the share of a center's total square footage that is attributable to its anchors) and a primary trade area (the area from which 60% to 80% of the center's sales originate) or 3 to 6 miles." Appraisal Institute, The Dictionary of Real Estate Appraisal, 232 (5th ed. 2010). Conversely, a neighborhood center "reflects a convenience concept and typically encompass 30,000 to 150,000 square feet of gross leasable area, including anchors, on 3 to 5 acres. They will typically have one or more anchors . . . with a 30% to 50% anchor ratio and a primary trade area






with Prospect Avenue, however, the property slopes downward toward the western or rear boundary (at Terrace Avenue). The shopping center's upper-tier stores are generally at grade-level with Prospect Avenue and Eagle Rock Avenue. However, the center's mid-tier stores are approximately one story below the upper-tier due to the property's downward slope. Additionally, the center's lower-tier stores are approximately two stories below the upper-tier and one story below the mid-tier. Retaining walls and sloping macadam driveways exist between the upper-tier, mid-tier, and lower-tier to account for the continuing downward slope and provide vehicular access throughout the center. Due to the property's topography, slope, and the center's layout, the mid-tier stores are only partially visible, and the lower-tier stores are not visible from Prospect Avenue.

The shopping center comprises approximately 293,079 square feet of gross leasable area.[4] The upper-tier of the center comprises approximately 254,788 square feet, inclusive of a basement area, and retail tenants including Whole Foods, K-Mart, Staples, Dollar Tree, Jersey Mike's Subs, and Chipotle Mexican Grill restaurant.[5] The center's mid-tier consists of approximately 20,486 square feet and includes a Retro Fitness and several in-line tenants. The lower-tier consists of approximately 8,167 square feet and includes several in-line tenants. The subject property also

---

of 3 miles." Id. at 232. Here, based on the subject property's lot size, gross leasable area, and character, the court finds that it more closely resembles a community shopping center.

[4] During trial, Plaza's expert offered testimony that the shopping center comprises 283,940 square feet of gross leasable area. In comparison, West Orange's expert offered testimony that the shopping center comprises 293,079 square feet of gross leasable area. The difference between the calculations arises from how each party characterizes the 9,139 square feet of mezzanine area in the center's Whole Foods supermarket.

[5] According to Plaza's expert, the K-Mart store was "shuttered," or ceased retail operations, in or about January 2020. However, K-Mart continues to lease 198,912 square feet of the center's upper-tier and sublets a portion of the leasable area to Staples, Dollar Tree, and Vision World.


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



contains two single-tenanted detached buildings. One of the single-tenanted detached buildings comprises 2,013 square feet and is located along the corner of Prospect Avenue and Eagle Rock Avenue and is occupied by Verizon Wireless. The other single-tenanted detached building comprises 7,625 square feet, and is located along Prospect Avenue, at the subject property's northern boundary line, and is occupied by Mavis Discount Tire Center.

K-Mart leases approximately 198,912 square feet of the upper-tier of the shopping center, comprising approximately 96,000 square feet of ground floor space and approximately 102,912 square feet of basement area.[6] As of each valuation date at issue, K-Mart subleased 35,000 square feet of its upper-tier ground floor area to Staples and Dollar Tree, and 5,000 square feet of its upper-tier ground floor area to Vision World. K-Mart retained approximately 56,000 square feet of the upper-tier ground floor space and the basement space, comprising approximately 102,912 square feet. Each subleased area contains interior demising walls and is distinct from the K-Mart space.

The basement is accessible in only two ways: (i) use of the escalators/stairs or elevator in the interior of the K-Mart store, or (ii) from the basement's side exterior wall, located at the mid-tier level.[7] The Staples, Dollar Tree, and Vision World stores have no access to the basement. Notably, the basement side exterior wall is obscured by a retaining wall and is not visible from Prospect Avenue.

The Whole Foods supermarket occupies approximately 42,430 square feet of the upper-tier's ground floor area and has a 9,139 square foot finished mezzanine area. The mezzanine area

---

[6] Approximately fifty percent of the basement space is finished, and fifty percent is unfinished.
[7] The basement side exterior wall contains three glass doors located at the mid-tier level.





includes the bakery kitchen, ovens, refrigerators, coolers, an employee lounge, an employee locker room, and employee restrooms.[8]  The mezzanine area is used only by Whole Foods employees and is accessible from a freight elevator and a stairway.  Plaza and West Orange disagree whether this mezzanine area should be valued.

The subject property is in West Orange's P-C – Planned Shopping Center District with principal permitted uses that include retail stores, restaurants, bars, personal service establishments, theaters, and civic centers.[9]  Thus, the operation of a community shopping center on the subject property is a legally conforming use.

The site is serviced by public utilities, including municipal sewer and water, natural gas, electric, and telephone.  The subject property is in a Non-Special Flood Hazard Zone X, denoting an area of "minimal flood hazard."[10]

Plaza timely filed complaints challenging the subject property's 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments.  The court tried the matters to conclusion over several days.

During trial, Plaza and West Orange each offered testimony from New Jersey certified general real estate appraisers, who were accepted by the court, without objection, as experts in the field of property valuation (referred to herein as "Plaza's expert" or "West Orange's expert").  Each expert prepared an appraisal report containing photographs of the subject property,

---

[8]  The Whole Foods grocery store was "gut renovated" and expanded in 2006.

[9]  The court's own review of the zoning maps, tax maps, and yellow highlighted area of the aerial photographs furnished during trial by Plaza and West Orange reveals that a portion of the subject property's western boundary, along Terrace Avenue, is apparently in the R5 – Single Family Residential District.  However, neither Plaza nor West Orange offered any testimony during trial regarding potential subdivision and development of that portion of the property or any analysis of potential surplus land.

[10]  https://www.fema.gov/glossary/flood-zones






supporting data, and expressing opinions of the subject property's fair market or true value as of the October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October 1, 2018 valuation dates.

As of each valuation date, the subject property's total property tax assessment, implied equalized value, and the experts' value conclusions are set forth below:

| Valuation date | Tax Assessment | Average ratio of assessed to true value | Implied equalized Value | Plaza's expert | West Orange's expert |
|---|---|---|---|---|---|
| 10/1/2013 | $50,000,000 | 97.38% | $51,345,245 | $39,620,000 | $64,305,000 |
| 10/1/2014 | $50,000,000 | 97.22% | $51,429,747 | $39,735,000 | $63,765,000 |
| 10/1/2015 | $50,000,000 | 93.90% | $53,248,136 | $39,735,000 | $67,300,000 |
| 10/1/2016 | $50,000,000 | 92.50% | $54,054,054 | $40,665,000 | $66,075,000 |
| 10/1/2017 | $50,000,000 | 89.81% | $55,673,088 | $34,875,000 | $63,735,000 |
| 10/1/2018 | $50,000,000 | 87.74% | $56,986,551 | $33,630,000 | $62,085,000 |

## II. Conclusions of Law

### A. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the taxpayers' proofs, the court must be presented with evidence that






raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

At the close of Plaza's proofs, West Orange moved to dismiss these matters under R. 4:37-2(b). Affording Plaza all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that Plaza produced cogent evidence sufficient to overcome the presumption of validity. The opinions of Plaza's expert, if accepted as true, raised debatable questions as to the validity of the local property tax assessments at issue. Accordingly, the court denied West Orange's motion and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the taxpayer . . . to demonstrate that the judgment [or local property tax assessment] under review was incorrect." Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

B.    Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The






highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-269 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).

Both experts concluded, in general terms, that the highest and best use of the subject property as vacant and as improved is for retail development, or more precisely, as a shopping center. However, the experts disagreed on the highest and best use of the K-Mart space.

Plaza's expert concluded that the highest and best use of the upper-tier's 198,912 square feet (comprising 96,000 square feet of ground floor area and 102,912 square feet of basement area) is for a single tenant anchor. In Plaza's expert's opinion, it is not reasonably foreseeable that the landlord would retain the 198,912 square feet, as it is currently subdivided, into four separate and distinct retail spaces. In Plaza's expert's opinion, the shopping center is "dominated" by the 102,912 square feet of basement space, which he concluded an investor would "zero out" and consider it non-rentable space for independent retail use. Accordingly, because the basement contains no windows, has both functional and physical limitations, and no demand exists in the marketplace for basement retail area, Plaza's expert reasoned that both its usefulness and value must be discounted.

Conversely, West Orange's expert opined that no market, or a limited market, exists for a single tenant anchor to occupy the upper-tier's 198,912 square feet. Instead, West Orange's expert concluded that the highest and best use of the upper-tier's ground floor and basement is to retain the upper-tier's subdivided "Big Box" and in-line retail stores as they presently exist. In addition, the unoccupied 56,000 square feet of upper-tier ground floor space should be subdivided into two






"Big Box" stores, and the unoccupied 102,912 square feet of basement area should be subdivided into two 50,000 square foot "Big Box" stores. Thus, in West Orange's expert opinion, the unoccupied K-Mart space should be divided into four additional "Big Box" retail stores. According to West Orange's expert, evidence of demand for "Big Box" stores exists on the subject property because K-Mart subleased approximately 35,000 square feet to "Big Box" stores, such as Dollar Tree and Staples. In West Orange's expert opinion, access to the basement "Big Box" stores could be provided through the basement's side exterior wall.[11]

The court concludes that certain aspects of the highest and best use conclusions reached by Plaza's expert and West Orange's expert, with respect to the use of the unoccupied K-Mart space, are not credible.

Evidence was adduced during trial that as of each valuation date, K-Mart subleased approximately 35,000 square feet of the upper-tier's ground floor to two "Big Box" stores, Staples, and Dollar Tree. In addition, K-Mart subleased an additional 5,000 square feet of the upper-tier's ground floor to an in-line store, Vision World. Thus, K-Mart retained 56,000 square feet of the upper-tier's ground floor and the 102,912 square feet of basement area.[12]

Here, the court finds that Plaza's expert's opinion, concluding that it was not reasonably foreseeable that a potential investor would retain the subdivided portions of the K-Mart's store on

---

[11] During cross-examination, West Orange's expert offered testimony that during the 1990s, demising walls existed in a portion of the basement space, along the basement side exterior wall, and that the area was used for retail space. However, the trial record reflects that no demising walls exist in the basement during the tax years at issue. Moreover, the trial record fails to contain any credible testimony regarding the cost to erect demising walls along the basement side exterior wall, and the exact square footage of the retail area that was attributable to the basement side exterior wall area.

[12] The terms of the sublease agreements between K-Mart, Staples, Dollar Tree, and Vision World were not introduced during trial.






the upper-tier's ground floor and continue to lease them to "Big Box" tenants and in-line tenants not credible. The record reveals that K-Mart's upper-tier ground floor is already subdivided into four smaller retail areas of approximately 56,000 square feet, 20,000 square feet, 15,000 square feet, and 5,000 square feet. Moreover, Plaza's December 31, 2014 rent roll assigns the Staples, Dollar Tree, and Vision World a "Store ID#" different from the "Store ID#" assigned to K-Mart. Additionally, Plaza's marketing and leasing materials for the subject property recognize the K-Mart as tenant number 4, Dollar Tree as tenant number 5, and Staples as tenant number 6. This demonstrates that Plaza already recognizes the different tenancies, characteristics, composition, and likelihood of continuing to lease these subdivided stores separately. Moreover, it is important to highlight that none of the four leases identified by Plaza's expert as comparable leases occupy more than 37,587 square feet. Thus, although Plaza's expert opines that a market exists for a single tenant to occupy the upper-tier's 198,912 square feet, the comparable leases forming the basis of Plaza's expert's market rent conclusion fail to demonstrate that any single tenant has leased close to 198,912 square feet of space in the marketplace. Rather, the comparable lease information relied on by Plaza's expert demonstrates that anchor tenants leased less than 19% of the square footage attributable to the subject property's upper-tier.

In addition, testimony and photographs were offered during trial that the upper-tier's ground floor has "clear" 18' ceiling height. Conversely, the unfinished basement has a "clear" 12'-14' unfinished ceiling height and finished ceiling height of only 10'.[13] Additionally, according

---

[13] Conflicting testimony was offered during trial concerning the basement ceilings' finished height. In addition, testimony was offered during trial that the front vestibule entrance area of the K-Mart and where the cashiers and café were located, consisting of approximately 6,000 square feet, is "almost a two-story height."






to Plaza's expert, only approximately 50,000 square feet of the basement area is finished. The remaining 50,000 square feet is unfinished and "doesn't look like it's been touched in twenty years. There's ceilings falling through, the offices are concrete, the tiles are pink. Then you are back to cavernous space that is inaccessible . . . There's no loading, in other words, you couldn't traverse the lower level . . . with a forklift to move material or product." Thus, both physical and functional problems would significantly impair a "Big Box" store from potentially using the basement space.

Moreover, the frontage along the basement side exterior wall (where West Orange's expert proposed the two entrances for the "Big Box" stores could be located), is very limited. During trial, West Orange's expert acknowledged that, "the potential number of units which can be developed . . . is limited due to the width of the frontage . . ." along the basement side exterior wall. Plaza's expert also offered credible testimony that despite efforts to lease the basement, there was no interest.

The court's review of the subject property photographs introduced during trial further reveals that the parking area immediately adjacent to the basement side exterior wall is limited. In sum, the basement side exterior wall entrance offers only limited access to the basement; the basement's functionality is constrained due to its low ceiling height; the basement area has not been updated in many years; the only potential entrances to the basement are located behind a retaining wall; and the basement side exterior wall offers no visibility from the street.[14] Consideration of these factors militate against the highest and best conclusion reached by West Orange's expert that, the basement's highest and best use is for occupancy by two "Big Box"

---

[14] "Functional utility can be extremely significant in shopping centers . . . Visibility and access are primary considerations in the analysis of retail improvements." Appraisal Institute, The Appraisal of Real Estate, 263-64 (14th ed. 2013).


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



stores. Rather, the court finds Plaza's expert's conclusion that the basement space would be included as part of the leasing of the upper-tier's ground floor anchor space to be more reasonable and supported by the evidence.

In addition, the court also rejects West Orange's expert's conclusion that the highest and best use of the unoccupied 56,000 square feet of upper-tier ground floor is for subdivision into two "Big Box" stores. Effective cross-examination disclosed that West Orange's expert highest and best use conclusions were premised on a cost to subdivide, erect demising walls, and conversion of $25.00 per square foot. However, other than an alleged conversations with a contractor, West Orange's expert's appraisal report contained no estimates, prices, quotes, reports, or calculations supporting his $25.00 per square foot cost. Moreover, cross-examination further revealed that the contractor did not inspect the subject property or view photographs of the subject property in arriving at his $25.00 estimate. Additionally, West Orange's expert did not know whether the contractor had any experience in converting a shopping center constructed in the 1960's into separate subdivided retail spaces. Further, testimony was elicited during trial that in 2006, the cost to renovate the subject property's Whole Foods was more than $174.00 per square foot. Accordingly, the court finds West Orange's expert's testimony regarding the estimated cost to convert the unoccupied 56,000 square feet, and consequently, his highest and best use conclusions for that space, not credible.

Accordingly, the court finds the highest and best use of the subject property's upper-tier is for: (i) rental of the approximately 35,000 square feet of subdivided area to "Big Box" tenants; and






(ii) rental of the approximately 56,000 square feet of ground floor, plus the 102,912 square feet of basement space, to a single anchor-like tenant.[15]

      C.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor Street LLC v. City of Jersey City, 21 N.J. Tax 232, 237-238 (Tax 2004) (citing Samuel Hird & Sons, Inc. v. City of Garfield, 87 N.J. Super. 65, 72 (App. Div. 1965)); see also ITT Continental Baking Co. v. East Brunswick Twp., 1 N.J. Tax 244, 251 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001), certif. denied, 168 N.J. 291 (2001) (citation omitted)). The "decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of New York v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610, 619 (Tax 1985).

When a property is income producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, LLC v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). See Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 269 (1987) (concluding that "[t]he income method is generally preferred for assessing income-producing property"); TD

---

[15] The court concludes that the remaining 11,320 square feet of upper-tier ground floor area (inclusive of the Verizon single-tenanted detached building but excluding the supermarket area), would continue to be leased to in-line retail tenants.






Bank v. City of Hackensack, 28 N.J. Tax 363, 378 (Tax 2015); Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 578 (Tax 1991).

Here, it is undisputed that the subject property is income-producing. Moreover, both experts employ the income capitalization approach, relying upon evidence derived from the marketplace to estimate the subject property's true or fair market value. The court finds the experts' conclusions credible and finds that the income capitalization approach is the method best suited for determining the subject property's true or fair market value.

### 1. Income Capitalization Approach

"The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013). See Parkway Village Apartments Co., 8 N.J. Tax 430 (Tax 1985), aff'd, 9 N.J. Tax 199 (App. Div. 1986), rev'd on other grounds, 108 N.J. 266 (1987); Helmsley v. Borough of Fort Lee, 78 N.J. 200 (1978); Hull Junction Holding Corp. v. Princeton Borough, 16 N.J. Tax 68 (Tax 1996).

Central to the income capitalization approach is "the determination of the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Village Apartments Co., 108 N.J. at 270. The term market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent allows an appraiser to accurately






forecast the stream of income to be generated by a property and to convert that future benefit into a present value.

### A. Market or Economic Rent

The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." The Dictionary of Real Estate Appraisal, at 121-22. The economic or market rent attributable to a property may differ substantially from the actual rent derived on a property, which may be below market rates. Parkview Village Assocs. v. Collingswood Bor., 62 N.J. 21, 29-30 (1972). However, "this does not mean that the actual rent is to be disregarded . . . 'in determining what is fair rental income, the actual rental income, while not controlling, is an element to be considered.'" McCrory Stores Corp. v. Asbury Park, 89 N.J. Super. 234, 243 (App. Div. 1965) (quoting Somers v. City of Meriden, 174 A. 184, 186 (Sup. Ct. Err. 1934)).

Although both experts utilized the income capitalization approach, they employed different theories on how the subject property should be valued. Plaza's expert opined that the Whole Foods mezzanine area, comprising approximately 9,139 square feet, should not be considered in deriving a value for the subject property. Conversely, West Orange's expert attributed the same economic rent to the Whole Foods ground floor and mezzanine areas. Plaza's expert determined an economic rent for the shopping center's mid-size and in-line areas, regardless of the tier in the center where they are located. Conversely, West Orange's expert determined different economic rents for the upper-tier, mid-tier, and lower-tier stores. In addition, as detailed above, Plaza's expert opined






that the highest and best use of the upper-tier's 198,912 square feet is for a single anchor tenant.

In contrast, West Orange's expert concluded that approximately 193,912 square feet of the upper-tier should be divided into "Big Box" stores.

1. Plaza's expert

Plaza's expert classified the subject property's retail space into four types: (i) anchor & larger; (ii) supermarket; (iii) mid-size; and (iv) in-line.

a. Anchor & Larger

Plaza's expert identified four comparable "Anchor & Larger" leases, designated as comparable leases 10, 11, 12, and 13 in his appraisal report and testimony. The comparable leases were in Pohatcong Township (Warren County), Randolph Township (Morris County), Livingston Township (Essex County), and Clifton City/Passaic City (Passaic County). The comparable leases comprised leased areas of 25,350 to 42,420 square feet. The leases bore commencement dates between February 2013 and February 2017. The unadjusted rents ranged from $10.00 to $25.75 per square foot.[16] In determining the effective rent for the comparable leases, Plaza's expert stated that he computed the average rent over each lease term. See First Republic Corp. of Am., 16 N.J. Tax at 578.

Finding that each comparable lease occupies smaller footprints than the subject property's 198,912 square feet, Plaza's expert applied a -5% size adjustment to comparable leases 10, 11, 12, and 13. According to Plaza's expert, a -5% size adjustment was warranted because "the K-Mart, its' a big, big, big space. . . ." After applying the adjustment, the adjusted rents of the four

---

[16] During cross-examination, Plaza's expert acknowledged that the unadjusted rental rate reported on page 62 of in his appraisal report for comparable lease 13 was incorrect and should be reported as $25.75.






comparable leases ranged from $9.50 to $24.46 per square foot.[17]   After analyzing the adjusted

rents, Plaza's expert opined an economic or market rent of $12.00 per square for the upper-tier

ground floor space.  However, with respect to the upper-tier's basement space, due to the physical

and functional limitations that exist with that space (troubled access, low ceiling heights, poor

visibility, lack of finish, etc.), Plaza's expert opined that the basement space would command a

$6.00 per square foot rent.  Ultimately, Plaza's expert applied, "on average," a $9.00 per square

foot value to the 198,912 square feet of the upper-tier's ground floor and basement space that he

categorized as "Anchor & Larger" retail space.

      b.    <u>Supermarket</u>

Plaza's expert identified six comparable supermarket leases.  For purposes of his appraisal

report and testimony, these leases were identified as comparable leases 17, 18, 19, 20, 21, and 22.

The comparable leases were in Howell Township (Monmouth County), Jefferson Township

(Morris County), Randolph Township (Morris County), Hillsborough Township (Somerset

County), Livingston Township (Essex County), and Clifton City/Passaic City (Passaic County).

The comparable leases comprised leased areas of 10,000 to 95,337 square feet.  The leases bore

commencement dates from March 2010 to July 2017.  The unadjusted rents ranged from $11.50

to $23.30 per square foot.  In determining the effective rent for the comparable leases, Plaza's

expert stated that he computed the average rent over each lease term.

Finding that comparable lease 17 occupies a larger footprint (95,337 square feet), Plaza's

expert applied a +5% size adjustment.  According to Plaza's expert, a +5% adjustment was

---

[17]   During cross-examination, Plaza's expert acknowledged that the adjusted rental rate reported
on page 62 of his appraisal report for comparable lease 13 was incorrect and should be reported as
$24.46.






warranted to comparable lease 17, "because the subject . . . Whole Foods is about half the size . . . at 42,430 square feet, so . . . I made an upwards adjustment for size . . . to indicate the size deviation." In addition, finding that comparable lease 21 occupies a smaller footprint (10,000 square feet), Plaza's expert applied a -5% size adjustment. According to Plaza's expert, a -5% adjustment was warranted to comparable lease 21, because it is "significantly smaller than that of the subject property's supermarket, . . . using the theory that unit prices vary adversely with size, I made a 5% adjustment." After applying the adjustments, the adjusted rents of the comparable leases ranged from $11.50 to $23.30 per square foot. Plaza's expert opined an economic or market rent of $15.00 per square for the subject property's supermarket. Plaza's expert applied the $15.00 per square foot economic rent to 42,430 square feet of the subject property's upper-tier that he categorized as supermarket space.

      c.    Mid-size

Plaza's expert identified three "Mid-size" comparable leases and one subject property "Mid-size" lease. His appraisal report and trial testimony identified those leases as comparable leases 14, 15, 16, and S4. The comparable leases consisted of leased areas from 7,920 to 17,600 square feet. The leases bore commencement dates from April 2013 to December 2016. The unadjusted rents ranged from $14.47 to $25.00 per square foot. In determining the effective rent for the four comparable leases, Plaza's expert stated that he computed the average rent over the lease term.

Plaza's expert applied a -5% size adjustment to comparable lease 16. In Plaza's expert's opinion, comparable lease 16 "was substantially smaller, for the Mid-Size space, . . . applying a unit theory that unit prices vary adversely with size, which is a common, and true adjustment." In






addition, Plaza's expert applied a -25% adjustment to comparable lease S4[18]. According to Plaza's expert, comparable S4 was a modified gross "landlord base year" lease; thus, to convert it from a modified gross lease to a net lease (like the other comparable leases), he made a -$6.25 per square foot adjustment. After applying the adjustments, the adjusted rents of the four comparable "Mid-size" leases ranged from $13.94 to $20.15 per square foot. After analyzing the adjusted rents, Plaza's expert concluded an economic or market rent of $15.00 per square foot for the subject property's "Mid-size" retail space. Plaza's expert applied the $15.00 per square foot economic rent to the subject property's 21,740 square feet, comprising the Retro Fitness and Mavis Discount Tire Center, that he categorized as "Mid-size" retail space (14,115 + 7,625 = 21,740 square feet).

      d.    <u>In-line</u>

Plaza's expert identified nine in-line leases and three subject property in-line leases. His appraisal report and trial testimony identified those leases as comparable leases 1, 2, 3, 4, 5, 6, 7, 8, and 9, and S1, S2, and S3. Out of the nine non-subject property comparable leases, six were in West Caldwell (Essex County), two were in Livingston (Essex County), and one was in Clifton/Passaic (Passaic County). The twelve comparable leases comprised leased areas of 960 to 6,400 square feet. The leases bore commencement dates between November 2010 and May 2015. The unadjusted rents ranged from $18.66 to $49.99 per square foot.[19] In determining the effective

---

[18] Comparable lease S4 is the subject property's Retro Fitness space which will be addressed by the court separately below.

[19] Plaza's expert's appraisal report page 47 identifies comparable lease 9 as having an unadjusted rent of $18.21 per square foot; however, Plaza's expert's adjusted rental grid on page 60 of his appraisal report identifies comparable lease 9 as having an unadjusted rent of $18.66 per square foot.






rent for the twelve comparable leases, Plaza's expert stated that he computed the average rent over the lease term.

Plaza's expert applied no adjustments to the subject property's three comparable leases. However, Plaza's expert applied a -5% size adjustment to comparable lease 4, and a +10% size adjustment to comparable lease 5, because it comprises 6,400 square feet of leasable area, "so as to have it pair better with the in-line analytics."

After analyzing the comparable in-line rents, Plaza's expert concluded an economic or market rent of $40.00 per square foot for the subject property's in-line retail space. Plaza's expert applied the $40.00 per square foot economic rent to the subject property's 20,862 square feet that he categorized as in-line retail space.

### 2. West Orange's expert

Like Plaza's expert, West Orange's expert classified the subject property's tenancies into different categories: (i) supermarket; (ii) "Big-Box"; (iii) "General Retail"; (iv) Retro-Fitness or fitness center; and (v) Mavis Discount Tire Center or automotive repair facility. However, in West Orange's expert opinion, the tier where each retail store is located materially impacts or affects market rent. Thus, West Orange's expert opined that the upper-tier retail space commands a higher rent than the mid-tier, which in turn, commands a higher rent than the lower-tier. Based on his review and analysis of the subject property's leases, he found that the upper-tier rents are approximately 40% higher than the mid-tier, and the upper-tier rents are approximately 66% higher than the lower-tier. Accordingly, West Orange's expert created sub-classifications for his "Big Box" and "General Retail" spaces, assigning a different economic or market rent to the retail area based on its respective tier.

   

a.      Anchor

In West Orange's expert's opinion, approximately 193,912 square feet of the subject property's upper-tier would be recast as "Big Box" retail stores. Accordingly, West Orange's expert did not offer the court any economic or market rent evidence for an anchor retail store.

b.      Supermarket

West Orange's expert identified four comparable supermarket leases. The comparable leases were in Clifton City (Passaic County), Sparta Township (Sussex County), Cloister Township (Bergen County), and Newark City (Essex County). The comparable leases comprised leased areas of 24,557 to 69,065 square feet. The leases bore commencement dates from January 2012 to December 2016. The unadjusted rents ranged from $16.50 to $32.49 per square foot.[20]

Finding that the Newark comparable lease is an inferior location to the subject property, West Orange's expert applied a +20% location adjustment. West Orange's expert explained that he applied adjustments to account for the comparable lease's "urban location" and because "Newark has certain additional taxes that are not found in West Orange, such as a payroll tax and a parking tax . . . so with all that considered I still felt that a 20% adjustment for location was necessary." After applying the adjustment, the adjusted rents of the comparable leases ranged from $19.80 to $32.49 per square foot. West Orange's expert opined an economic or market rent of $25.00 per square for the subject property's supermarket area.[21]

---

[20] West Orange's expert offered testimony that the $16.50 per square foot represents the initial rent over only the first five years of the lease; however, the average rental rate over the initial lease term is $18.07 per square foot.

[21] West Orange's expert applied the $25.00 per square foot economic rent to 51,569 square feet of the subject property that he categorized as "Supermarket" retail space. In computing the 51,569 square feet, West Orange's expert included the 9,139 square foot mezzanine area in the Whole Foods grocery store (42,430 square feet + 9,139 square feet = 51,569 square feet).






Interpreter

ADA
Americans with
Disabilities Act

ENSURING
AN OPEN DOOR TO
JUSTICE

   c. Big Box

West Orange's expert identified six retail leases of "Big Box" retail stores he found comparable to the subject property. One of the comparable leases was in East Hanover (Morris County), one of the comparable leases was in West Orange (Essex County), and four of the comparable leases were in Livingston (Essex County). The comparable leases consisted of leased areas of 25,350 to 50,182 square feet. The leases bore commencement dates between February 2011 to December 2015. The unadjusted rents ranged from $15.00 to $18.50 per square foot.

West Orange's expert applied -5% location adjustment to each of the comparable Livingston leases and the comparable East Hanover lease. In West Orange's expert's opinion, the East Hanover and Livingston locations are superior to the subject property's location, accordingly, a -5% location adjustment is warranted. After applying the adjustments, the adjusted rents of the comparable leases ranged from $15.00 to $17.57 per square foot. West Orange's expert opined an economic or market rent of $16.25 per square for the subject property's upper-tier "Big Box" retail stores.

   d. General Retail

West Orange's expert identified eight leases of "General Retail," or in-line retail stores that he found comparable to the subject property. Six comparable leases were in West Orange Township (Essex County), and two were in West Caldwell Township (Essex County). The comparable leases comprised leased areas of 1,120 to 2,557 square feet. The leases bore commencement dates from July 2012 to March 2018. The unadjusted rents ranged from $27.50 to $50.00 per square foot.






West Orange's expert applied no adjustments to any of the "General Retail" leases. West Orange's expert opined an economic or market rent of $35.50 per square for the subject property's upper-tier ground floor "General Retail" stores. In addition, after reviewing and analyzing the "General Retail" leases for the subject property, West Orange's expert concluded that the upper-tier "General Retail" stores will command a 40% greater rental rate than the subject property's mid-tier retail stores. Accordingly, after applying a 40% discount, West Orange's expert concluded an economic or market rent of $21.30 per square for the subject property's mid-tier "General Retail" stores ($35.50 - $14.20 = $21.30). Moreover, after comparing the subject property's upper-tier and lower-tier retail leases, West Orange's expert concluded that the upper-tier "General Retail" stores would command a 66% higher rental rate than the subject property's lower-tier retail stores. Accordingly, after applying a 66% discount, West Orange's expert concluded an economic or market rent of $12.07 per square for the subject property's lower-tier "General Retail" stores ($35.50 - $23.43 = $12.07).

e.    Retro-Fitness

In 2014, Plaza negotiated a modified gross lease agreement with Retro Fitness for 14,115 square feet of the subject property's mid-tier area at the rate of $23.00 per square foot. West Orange's expert reviewed and analyzed the subject property's lease with Retro-Fitness, along with the Big Box and General Retail comparable leases. Based on what he opined was "the paucity of similar market rental data," West Orange's expert concluded that the subject property's lease with Retro Fitness represents the market or economic rent for a fitness center. However, because the lease agreement was a modified gross lease, he "deducted $5.50 per square foot from the contract






rent to reflect a net rental." As a result, West Orange's expert opined an economic or market rent of $18.00 per square for the subject property's Retro Fitness area.

### f. Mavis Discount Tire Center

In 2015, Plaza negotiated a renewal lease agreement with Mavis Discount Tire Center for the 7,625 square foot single-tenanted stand-alone building at an average rent of $25.45 per square foot.[22] West Orange's expert reviewed and analyzed the renewal lease with Mavis Discount Tire Center, along with the Big Box and General Retail comparable leases. Again, due to the lack of available market data on automotive repair facility leases, West Orange's expert concluded that the subject property's renewal lease with Mavis Discount Tire Center represents the market or economic rent for an automotive repair facility. Thus, West Orange's expert opined an economic or market rent of $25.45 per square for the subject property's 7,625 square foot single-tenanted stand-alone automotive repair facility.

### 3. Analysis

### a. Anchor - upper-tier ground floor

As expressed above, this category comprises the retail area in the subject property's upper-tier totaling approximately 56,000 square feet.[23]

The court's review of Plaza's expert's comparable leases 11, 12, and 13 discloses that each center is located within a twenty-mile radius of the subject property. However, the court notes that comparable lease 10 is in Pohatcong Township, Warren County, approximately sixty miles from

---

[22] Apparently, Somerset Tire Service occupied the building under a 1982 lease agreement expiring in 2018. However, in or about 2017, Mavis Discount Tire acquired the location and negotiated a renewal lease at an average annual rent of $25.45 per square foot.

[23] The court highlights that only approximately thirty-five percent of the space characterized as "Anchor" is at grade level, the remaining sixty-five percent is basement area.






the subject property. During cross-examination, Plaza's expert candidly admitted that "it's about an hour to get to Pohatcong." Thus, the court does not find comparable lease 10 to be in the subject property's market area. Accordingly, the court accords comparable lease 10 little weight.

The court finds Plaza's expert's adjusted rents for comparable leases 11, 12, and 13 are more credible evidence of the economic or market rent for the subject property's upper-tier ground floor space. Therefore, analyzing the adjusted rents of comparable leases 11, 12, and 13 against Plaza's expert's concluded $12.00 per square foot rent for the upper-tier ground floor space, the court must reject Plaza's expert's conclusion. After analyzing the adjusted rents of comparable leases 11, 12, and 13 (attributing little weight to comparable lease 10), the court finds that a $15.00 per square foot economic or market rent should be attributed to the 56,000 square feet of the subject property's upper-tier ground floor area as of each valuation date at issue.

b. Upper-tier basement

This category comprises the retail area in the subject property's upper-tier basement totaling approximately 102,912 square feet.

Arriving at a market or economic rent for the subject property's upper-tier basement area is challenging. Plaza's expert offered credible testimony that significant physical and functional limitations exist with the basement space and attempting to lease it independently from the upper-tier's ground floor. Currently, access to the basement is afforded only by escalators and an elevator in the interior of the K-Mart space or through three glass doors in the basement's side exterior wall. However, as detailed above, the width of the frontage along the basement's side exterior wall is very narrow. Moreover, the parking area immediately adjacent to the basement's side exterior wall is limited, making the basement space less desirable. Further complicating the matter,

   

the basement side exterior wall is located behind a retaining wall and is not visible from Prospect Avenue or Eagle Rock Avenue. Additionally, Plaza's expert offered credible testimony that despite efforts to market the basement space, there has been no interest in the marketplace. Plaza's expert further provided credible testimony that the basement area has not been updated for many years. Moreover, Plaza's expert was unable to find any comparable basement retail store leases. However, after analyzing the adjusted rents for the upper-tier ground floor stores, Plaza's expert opined that the basement retail area should reflect an economic or market rent of $6.00 per square foot.

Similarly, West Orange's expert offered no comparable leases or other evidence of basement retail stores. Instead, West Orange's expert opined that the highest and best use of the basement was for subdivision into two "Big Box" stores. Without restating the substance of the court's opinion above, the court rejects West Orange's expert's highest and best use conclusions and proposed methodology for valuing the subject property's basement area.

However, given the subject property's unique functional limitations, physical characteristics, and the apparent lack of comparable retail basement data in the marketplace, the court finds credible Plaza's expert's concluded market rent of $6.00 per square foot for the subject property's upper-tier basement area.

c.   Supermarket – ground floor

The subject property's supermarket occupies 42,430 square feet of ground floor area and 9,139 square feet of mezzanine area.

The court's review of Plaza's expert's comparable leases 17, 18, 19, 20, 21, and 22 discloses that comparable leases 19, 21, and 22 are all located within a twenty-mile radius of the






subject property. Cross-examination disclosed that comparable lease 17 is approximately fifty to sixty miles from the subject property, comparable lease 18 is approximately thirty miles from the subject property, and comparable lease 20 is approximately forty miles from the subject property. Thus, the court does not find comparable leases 17, 18, and 20 to be in the subject property's market area and competitive with the subject property. Accordingly, the court accords comparable leases 17, 18, and 20 little weight.

In addition, although comparable lease 21 is within the subject property's market area, it was entered into in May 2010, more than three years prior to the earliest valuation date involved in these proceedings and during the well-documented national economic downturn.[24] Moreover, comparable lease 21 involves the lease of a farmer's market, not a traditional supermarket. Thus, comparable lease 21 contains no bakery, no café, and no ovens, like the subject property's supermarket. Accordingly, because a three-year period elapsed between the execution of comparable lease 21 and the earliest valuation date involved in these matters, the court will accord comparable lease 21 little weight.

For the foregoing reasons, the court finds Plaza's expert's adjusted rents for comparable supermarket leases 19 and 22 the most credible evidence of economic rent for the subject property's ground floor supermarket area.

The court's review of West Orange's expert's four comparable supermarket leases discloses that both the Sparta and Cloister comparable supermarket leases are more than thirty miles from the subject property. Conversely, the Clifton lease and Newark lease are within twenty

---

[24] See Glenpointe Associates v. Teaneck Twp., 31 N.J. Tax 596, 637 (Tax 2020); Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 481 (Tax 2013).






miles of the subject property. Thus, the court does not find the Sparta and Cloister comparable supermarket leases to be in the subject property's market area and competitive with the subject property. Accordingly, the court will afford the Sparta and Cloister supermarket leases little weight.

The court finds West Orange's expert's adjusted rents for the Clifton and Newark supermarket leases, the most credible evidence of economic rent for the subject property's ground floor supermarket area.

In reviewing and analyzing the four supermarket leases that the court finds are the most credible evidence of the subject property's economic rent, the court highlights that Plaza's expert's comparable lease 22 and West Orange's expert's Clifton supermarket lease are the identical leases with identical adjusted rental values. Analyzing the three comparable supermarket leases discloses the following adjusted rental range: $11.50, $19.80, and $23.30 per square foot, with a mean of $18.20 per square foot. After considering the execution dates, area leased, and proximity of each comparable supermarket lease to the subject property, the court rejects Plaza's expert's $15.00 per square foot rent and West Orange's expert's $25.00 per square foot rent, for the subject property's supermarket ground floor. Rather, the court finds that the evidence presented supports an $18.00 per square foot economic or market rent for the subject property's supermarket ground floor comprising 42,430 square feet.

d. Supermarket - mezzanine

The court finds that the 9,139 square foot mezzanine area in the subject property's Whole Foods should be included in determining the subject property's market value. The court finds that the May 2005 lease agreement between Plaza and Whole Foods represents the best evidence in the






marketplace as to whether the subject property's supermarket mezzanine area would be charged

and assessed a separate rent. Here, the arms-length lease agreement negotiated between Plaza and

Whole Foods attributes rent to the 42,430 square feet of the ground floor and a separate rent to the

mezzanine's 9,139 square feet.[25]

Moreover, although Plaza's expert and West Orange's expert offered conflicting testimony

and evidence whether the New Jersey marketplace will assess a separate rent to supermarket

mezzanine areas, the court finds the testimony of West Orange's expert more convincing on this

issue. West Orange's expert offered credible testimony of other recent leases in northern New

Jersey that assess additional rent to a supermarket mezzanine area. Conversely, Plaza's expert

offered a lease in southern/central New Jersey that merely defined the leasable area as including

the ground floor, and for which no mezzanine was constructed.

Therefore, affording the greatest weight to the subject property's lease with Whole Foods,

the court finds that the marketplace will attribute a rent to the subject property's 9,139 square feet

of supermarket mezzanine area. However, for the reasons expressed above, the court does not find

West Orange's expert's concluded rent of $25.00 per square foot for the subject property's

supermarket and supermarket mezzanine area credible evidence of market rent. Additionally,

because Plaza's expert opined that no rent should be attributed to the subject property's 9,139

square foot supermarket mezzanine area, the court record is devoid of any evidence from Plaza's

---

[25] Testimony was offered during trial that due to its remoteness in time, the Whole Foods rent was not representative of the subject property's economic rent, as of the valuation dates involved herein. However, the court observes that the negotiated rent for the Whole Foods mezzanine area was 41% less than the negotiated rent for the ground floor area during the first five years of the lease term. Thus, in ascribing a rent to the mezzanine area, the market attributed an approximately 41% discount to the mezzanine rent from the ground floor rent.






expert regarding how the market would assign a rent to the mezzanine area. Importantly, however, the court's review of Plaza's lease with Whole Foods demonstrates that a discount of approximately 41% was applied in the marketplace to the rent attributable to the supermarket's mezzanine area compared to that of the supermarket's ground floor rent. Therefore, the court will apply a 41% discount to the court's concluded market rent for the subject property's supermarket's ground floor in arriving at a market or economic rent for the supermarket's mezzanine area. Accordingly, the court finds that the evidence presented supports a $10.60 per square foot economic rent for the subject property's supermarket mezzanine area, comprising 9,139 square feet ($18.00 - $7.38 = $10.62).

e.    Mid-size/Big Box

This category comprises retail stores in the subject property totaling approximately 49,115 square feet.[26]

The court's review of Plaza's expert's comparable lease 14 discloses that it was executed in January 2011, approximately two-and-a-half years prior to any valuation date involved in these matters. Thus, given the two-and-a-half-year period that elapsed between the execution of comparable lease 14 and the earliest valuation date involved in these matters, the court does not find comparable lease 14 credible and probative evidence of the market or economic rent as of any of the valuation dates involved herein.

---

[26]  For reasons expressed later herein, with respect to the Retro Fitness space, the court finds the testimony of Plaza's expert more credible. Accordingly, the court includes the Retro Fitness space in this category of retail area. In addition, with respect to the Mavis Discount Tire Center space, the court finds the testimony of West Orange's expert more credible. Accordingly, the court excludes the Mavis Discount Tire Center from this category of retail area and finds that it should be characterized as an automotive repair facility and valued in that manner.






Similarly, the court's review of West Orange's expert's East Hanover lease discloses that it was executed in February 2011, approximately two-and-a-half years prior to any valuation date involved in these matters. Thus, given the two-and-a-half-year period that elapsed between the execution of the East Hanover lease and the earliest valuation date involved in these matters, the court does not find West Orange's expert's East Hanover lease credible and probative evidence of the market or economic rent as of any of the valuation dates involved herein.

In sum, the court finds Plaza's expert's comparable leases 15 and 16, and West Orange's expert's four comparable Livingston leases, and one West Orange lease credible evidence of the market or economic rent for the mid-size or "Big Box" retail space.

Analyzing the remaining seven leases discloses the following range of adjusted rents for the mid-size or "Big Box" leases: $13.94, $15.00, $15.20, $15.67, $17.49, $17.57, and $20.15. The median is $15.67 per square foot, and the mean is $16.43 per square foot. After evaluating the foregoing comparable leases, the court concludes that West Orange's expert's concluded economic or market rent of $16.25 per square foot is reasonable and should be attributed to the 49,115 square feet of mid-size or "Big Box" retail area in the subject property, including the Retro Fitness space.

>   f.   Retro Fitness

During trial, testimony was elicited that in or about October 2013, Plaza negotiated a lease agreement with Retro Fitness for 14,115 square feet. The negotiated rent was $25.00 per square foot. However, the lease was a modified gross lease, obligating Retro Fitness to pay only a percentage of real estate taxes and operating costs over the lease's base year costs. Both experts opined that net leases are customary in the marketplace.

   

To align the Retro Fitness lease with the subject property's net leases, Plaza's expert applied a -25% adjustment to the Retro Fitness rent, making a $6.25 deduction from the $25.00 per square foot rent, to account for the difference in lease terms. As a result, Plaza's expert concluded an adjusted rent for the Retro Fitness lease of $18.75 per square foot. In addition, Plaza's expert offered testimony that although Retro Fitness has interior improvements different from the other mid-size retail space, the tenant generally undertakes those improvements at the tenant's cost. Accordingly, Plaza's expert reconciled the adjusted Retro Fitness rent with the other Mid-size leases to arrive at a concluded rent of $15.00 per square foot for the Retro Fitness space.

Conversely, West Orange's expert applied a -22% adjustment to the Retro Fitness rent, making a $5.50 deduction from the $25.00 per square foot rent to account for the difference in lease terms. West Orange's expert rounded down his adjusted rent to $18.00 per square foot and applied it only to the 14,115 square feet occupied by Retro Fitness. However, West Orange's expert opined that the Retro Fitness has unique interior improvements and thus should be valued separately from the mid-size or "Big Box" retail areas.

The court recognizes that the Retro Fitness area contains interior improvements distinct from other Mid-size or "Big Box" stores. However, the court finds Plaza's expert's opinions more credible on this issue, that the interior improvements are generally undertaken by and at the tenant's cost. Thus, the leasable area being delivered for use as a fitness center is both physically and functionally equivalent to the other Mid-size and "Big Box" stores. Therefore, the court concludes that the Retro Fitness space should be assigned the rent attributable to the Mid-size or "Big Box" areas of $16.25 per square foot.






g.    In-line/General Retail and Verizon single-tenanted stand-alone building

The trial record is replete with testimony and photographic evidence regarding the unique physical characteristics and attributes of the subject property. Although the center's upper-tier retail area and the Verizon Wireless stand-alone building are generally level with Prospect Avenue, because of the property's downward sloping topography (from Prospect Avenue toward the property's western boundary at Terrace Avenue), the mid-tier stores are approximately one story below the upper-tier; and the center's lower-tier stores are approximately two-stories below the upper-tier, and one-story below the mid-tier. Accordingly, retaining walls and sloping macadam driveways exist between the upper-tier, mid-tier, and lower-tier to account for the continuing downward slope and to provide vehicular access throughout the center. However, because of these topographical challenges, portions of the mid-tier retail area are obscured and not readily visible; and the lower-tier is almost completely obscured.

In Plaza's expert's opinion, the in-line or "General Retail" areas of the subject property's center should be similarly valued. Thus, Plaza's expert examined nine leases in the market area that he found comparable to the subject property and three of the subject property's in-line leases to arrive at a concluded economic or market rent of $40.00 per square foot.

Conversely, West Orange's expert approached valuation of the in-line or "General Retail" areas differently. After analyzing the subject property's rent rolls, West Orange's expert concluded that rental rates for the upper-tier retail stores are approximately forty percent higher than those of the mid-tier retail stores. Moreover, he concluded that rental rates for the upper-tier retail stores are approximately sixty-six percent higher than those of the lower retail stores. In West Orange's expert opinion, the rent disparity is due to their location in the center and less






desirability of the mid-tier and lower-tier stores compared to the upper-tier stores. Thus, he reasoned that the market accounted for these physical differences by applying a discount to the economic rent to the mid-tier and lower-tier in-line stores. Accordingly, after arriving at a market or economic rent for the upper-tier's in-line or "General Retail" stores, he applied a forty percent discount to conclude an economic or market rent for the mid-tier stores. Similarly, in arriving at a concluded market or economic rent for the subject property's lower-tier in-line stores, West Orange's expert applied a sixty-six percent discount to his concluded economic rent for the upper-tier retail stores.

Although the court understands West Orange's expert's conclusions and recognizes the effort undertaken to analyze the subject property's rent rolls, the court finds that examining leases that, in certain cases date back as far as 1982, does not enable the court to conclude with certainty that a forty percent or sixty-six percent discount should be applied to calculate the mid-tier and lower-tier economic or market rent. Based on the court's review of the subject property's photographs, the court agrees with both experts' observations, that the mid-tier and lower-tier stores suffer from visibility issues, not present with the upper-tier. However, without a side-by-side comparison of historical leasing activities on the subject property analyzing similar leasing periods and the corresponding rents charged amongst the three tiers during a given period, the court cannot conclude that the discounts applied by West Orange's expert accurately account for those physical differences. Accordingly, the court will apply one economic or market rent to all of the subject property's in-line/"General Retail" and the Verizon single-tenanted stand-alone building.






The in-line/"General Retail" and the Verizon stand-alone building comprises approximately 25,858 square feet of the center allocated as follows: (i) 11,320 square feet of subject property's upper-tier; (ii) 6,371 square feet of the mid-tier; and (iii) 8,167 square feet of the lower-tier.

The court's review of Plaza's expert's comparable leases 1, 2, 3, 4, 5, 6, 7, 8, 9, and West Orange's expert's six West Orange leases and two West Caldwell leases discloses that each lease is in a shopping center similarly sized to the subject property, and located within minutes of the subject property.[27][28] In addition, with the exception of comparable lease 9, all the comparable in-line leases are in Essex County. Moreover, the court's review of Plaza's expert's subject property leases, S1, S2, and S3, discloses that they were executed in November 2010, June 2013, and September 2013. Additionally, S2 and S3 were executed close to the October 1, 2013 valuation date involved herein. The court further highlights that Plaza's expert's comparable subject property leases S2 and S3 are identical leases to two of West Orange's expert's comparable leases. Therefore, although it is a subject property lease because comparable lease S1 was executed in November 2010, approximately three years prior to the earliest valuation date involved herein, the court accords S1 little weight.

Accordingly, the court finds that Plaza's expert's comparable leases 1, 2, 3, 4, 5, 6, 7, 8, 9, S2, and S3, and West Orange's expert's six West Orange leases and two West Caldwell leases, represent comparable in-line retail store leases in the West Orange marketplace. Analyzing the

---

[27] Plaza's expert's comparable lease 9 is the most distant, in Clifton, New Jersey, less than twenty miles from the subject property.

[28] Cross-examination disclosed that the verification source of Plaza's expert's information for comparable leases 1, 2, 3, 4, 5, and 6 were rent rolls.






foregoing leases discloses the following range of adjusted rents: $18.66, $20.00, $22.00, $24.00, $24.48, $24.76, $27.50, $29.45, $31.75, $32.47, $33.00, $33.16, $34.20, $35.00, $36.06, $35.12, $36.76, $49.99, and $50.00.[29]  The mean for the foregoing leases is $31.49 per square foot.  After evaluating the foregoing comparable leases, the court finds that an economic or market rent of $32.00 per square foot is reasonable and supported by the evidence and should be attributed to the subject property's 33,483 square feet of in-line retail area and the Verizon single-tenanted stand-alone building, as of each valuation date.

> h.  Mavis Discount Tire Center

The court finds the testimony of West Orange's expert more credible with respect to the valuation of the Mavis Discount Tire Center single-tenanted stand-alone building.  Although the building contains a retail component, photographs demonstrate that the building principally comprises an automotive repair facility with approximately five automobile service bays.  Thus, Plaza's expert's valuation of the Mavis Discount Tire Center, as a mid-size retail store, does not accurately depict the most maximally productive use, as of each valuation date.  Therefore, the court finds West Orange's expert opined economic or market rent of $25.45 per square foot is reasonable and supported by the evidence.  Accordingly, the court will attribute a $25.45 per square foot market or economic rent to the 7,625 square foot Mavis Discount Tire Center single-tenanted stand-alone building.

> B.  Vacancy and collection loss

Plaza's expert examined the subject property's historical vacancy rates and generated a

---

[29]  The court highlights that the rent reported by Plaza's expert for two of the subject property leases, S2 and S3, was $49.99 and $36.76 per square foot.  However, West Orange's expert reported the rent for the same leases as $50.00 and $35.00 per square foot.






vacancy study utilizing CoStar, analyzing thirty-four retail buildings within a ten-mile radius of the subject property. According to Plaza's expert, the subject property experienced the following vacancy rates: (i) 22.2%, in 2013; (ii) 0%, in 2014; (iii) 1.7%, in 2015; (iv) 21.4%, in 2016; (v) 0.5%, in 2017; and (vi) 0.5% in 2018. Moreover, Plaza's expert's vacancy study disclosed vacancy rates amongst the thirty-four retail buildings surveyed of: (i) 4%, 3rd Quarter 2013; (ii) 6%, 3rd Quarter 2014; (iii) 3.3%, 3rd Quarter 2015; (iv) 1.9%, 3rd Quarter 2016; (v) 5.2%, 3rd Quarter 2017; and (vi) 6.6%, 3rd Quarter 2018.[30] Accordingly, Plaza's expert opined a stabilized vacancy and collection loss factor of 5% should be applied for the 2014 to 2017 tax years, and a stabilized vacancy and collection loss factor of 15% should be applied for the 2018 and 2019 tax years.

Similarly, West Orange's expert reviewed the subject property's vacancy rates. In addition, he reviewed Avison Young Real Estate Advisory Group vacancy reports and Real Estate Information Services ("REIS") vacancy reports for neighborhood and community shopping centers in the Essex County retail submarket area. According to West Orange's expert, the subject property experienced the following vacancy rates: (i) 3.21%, in 2014; (ii) 1.16%, in 2015; (iii) 1.72%, in 2016; and (v) 0.0% in 2018.[31] In addition, according to West Orange's expert, the Avison Young data revealed the following retail vacancy rates: (i) 5.80%, 3rd Quarter 2014; (ii) 5.50%, 3rd Quarter 2015; (iii) 5.10%, 3rd Quarter 2016; (iv) 5.30%, 3rd Quarter 2017; and (v) 5.40%, 3rd Quarter 2018. The REIS vacancy report disclosed the following retail vacancy rates: (i) 6.50%, in 2015; (ii) 7.90%, in 2016; (iii) 6.90%, in 2017; and (iv) 9.10%, in 2018. Accordingly,

---

[30] The CoStar report delineating the thirty-four properties surveyed was not annexed to Plaza's expert's appraisal report.

[31] West Orange's expert explained that he did not have the subject property's 2013, 2017, and 2018 rent rolls and only partial leases and lease abstracts for 2014, 2015, 2016, and 2018.






West Orange's expert opined a stabilized vacancy and collection loss factor of 5% for the 2014 to 2019 tax years.

The court's own review of the subject property's historical vacancy rates discloses that vacancy and collection loss has been minimized, resulting in vacancy rates generally below five percent. In addition, the CoStar report commissioned by Plaza's expert demonstrates that the total percent vacant of shopping centers within a ten-mile radius of the subject property has increased from 1.9% in the 4th Quarter 2013 to 6.9% in the 4th Quarter 2018. Moreover, the court's review of the Avison Young "Monthly Data" reveals the following annually reported vacancy rates and vacancy trends for neighborhood and community shopping centers in the Essex County submarket: (i) 6.5%, in 2014; (ii) 7.9%, in 2015; (iii) 6.9%, in 2016; and (iv) 9.1%, in 2017. Moreover, the Avison Young Monthly Data reveals 3rd Quarter 2018 vacancy rates of 8.5%.

After considering the experts' testimony and reviewing the above data and information, the court finds that a vacancy and collection loss factor of 6% is supported by the data and trial testimony and should be applied to the subject property as of the October 1, 2013, October 1, 2014, October 1, 2015, and October 1, 2016 valuation dates; and a vacancy and collection loss factor of 9% is supported by the data and trial testimony and should be applied to the subject property as of the October 1, 2017, and October 1, 2018 valuation dates.

C.    Stabilization

Once economic or market rent, and vacancy and collection loss has been determined, the appraiser must discern the stabilized expenses to be applied to the Effective Gross Income. Stabilization "involves elimination of abnormalities or any additional transitory conditions from stated income or expenses to reflect conditions that are expected to continue over the economic






life of the property." First Republic Corp. of America, 16 N.J. Tax at 579 (Tax 1997) (citing The Dictionary of Real Estate Appraisal, 344-45 (3rd ed. 1993)). Consistent with that principle, under the income capitalization approach, the appraiser must perform a "comprehensive analysis of the annual expenses" and income of the property being appraised. The Appraisal of Real Estate, at 453. As part of that analysis the appraiser will prepare a reconstructed operating statement to "reflect the potential future performance of a property, considering the historical income and expenses of an investment property." Ibid. See also Parkway Village Apartments Co., 8 N.J. Tax at 444 (concluding that "[i]t is clear that an appraiser's function is to reconstruct a yearly pattern of expenses . . . Expenses vary from year to year, and it is important to review operating statements for three or more years in order to determine whether certain expenses are typical or atypical."). Through an examination and analysis of the property's historical income and expense data, when measured against comparable properties in the market, an appraiser can discern the potential future performance of the property over its economic life.

However, no static rule can be applied when determining whether certain conditions will persist over a property's economic life. An appraiser must consider each project on a case-by-case basis and analyze the property's historical income and expenses against marketplace norms. When evidence discloses that a property's actual expenses are outside that of acceptable norms, an adjustment must be fashioned to fit the "well-managed" standard. Equitable Life Assur. Soc'y of U.S. v. Secaucus Twp., 16 N.J. Tax 463, 467 (App. Div. 1996). Therefore, in fashioning a reconstructed operating statement, an appraiser should rely on marketplace norms and those income and expenses that the evidence dictates will reasonably continue over a property's economic life and reject those that may be irregular, erratic, uncharacteristic, and not typical in the






industry.

    1.    <u>Operating expenses and reserves</u>

The experts' opinions regarding the stabilized operating expenses (management fees, real estate commissions, and structural reserves) to be applied to the subject property's Effective Gross Income were not very disparate.

Plaza's expert reasoned that management fees in shopping centers like the subject property range from 3% to 7% of Effective Gross Income. Accordingly, Plaza's expert concluded that given the size of the subject property's shopping center and the number of tenants located therein, a 3.5% management fee was appropriate. Conversely, West Orange's expert opined that a 5% management fee was reasonable for the subject property.

Based on Plaza's expert's survey of local real estate brokers, he found that leasing commissions for shopping centers are 5% of the aggregate rent. However, because he found that many tenants will renew their leases without the imposition of a leasing commission, Plaza's expert opined that a leasing commission expense of 3.75% of Effective Gross Income was reasonable. West Orange's expert similarly surveyed local commercial real estate brokers, finding that commissions should be estimated at 5% of the aggregate rent. Thus, West orange's expert opined that a leasing commission expense of 5% should be applied.

Finally, Plaza's expert opined that nationally, structural reserves in shopping centers like the subject property range from $0.10 to $0.50 per square foot. Thus, he opined that a structural reserve allowance of $0.35 per square foot of gross building area, or $99,380, should be applied for anticipated structural repairs to the subject property.[32] Plaza's expert's proposed structural

---

[32] Based on Plaza's expert's concluded gross leasable area of 283,944 square feet.






reserve allowance amounted to between 2.92% to 3.26% of estimated Effective Gross Income. Conversely, West Orange's expert opined that a reserve for structural and other repairs required by the landlord of 2% of Effective Gross Income should be applied.[33]

In sum, the experts stabilized operating expenses are reasonable and very similar. Here, Plaza's expert opined a 3.5% management fee, and West Orange's expert opined a 5% management fee. The court finds that a 4% management fee is reasonable in the marketplace. Plaza's expert opined that a stabilized expense for leasing commissions of 3.75% is appropriate, while West Orange's expert opined that 5% is appropriate. The court finds that a 3.75% stabilized expense for leasing commissions is reasonable in the marketplace. Plaza's expert opined a reserve and maintenance allowance of $0.35 per square foot, or between 2.92% to 3.26% of his estimated Effective Gross Income. West Orange's expert opined structural and other reserves of 2% of Effective Gross Income. The court finds that a reserve for structural repairs and maintenance of 2% of Effective Gross Income is reasonable in the marketplace.

Accordingly, the court will apply a 4.0% management fee, a 3.75% leasing commission, and 2.0% structural repair and maintenance reserve allowance of Effective Gross Income.

### 2. Tenant improvement allowance

In "certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as

---

[33] West Orange's expert broke down the calculation in his reconstructed operating statements as 1% for structural repairs and 1% for reserves.






tenant improvement allowances. Generally, the cost of these allowances is built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474.

Here, Plaza's expert explained that following the 2008 economic recession, the retail market was "structurally changed," requiring landlords of retail stores to furnish tenant improvement allowances to entice new tenants. Thus, Plaza's expert opined that tenant improvement allowances were customary in the subject property's market area during each of the valuation dates involved herein. In Plaza's expert's opinion, tenant improvement allowances range from $10 to $20 per square foot depending on whether the space is newly occupied or is being refitted after a previous tenant has vacated. In Plaza's expert's opinion, tenant improvement alterations generally have a ten-year life expectancy. Accordingly, Plaza's expert assumed a "conservative" $10.00 per square foot tenant improvement allowance expenditure, and an annual expense allowance of $1.00 per square foot, per year, for the subject property's gross leasable area.

Conversely, West Orange's expert concluded that a tenant improvement allowance was not warranted based on his review of the subject property's leases and the marketplace. However, effective cross-examination revealed that several leases relied on by West Orange's expert afforded tenant improvement allowances. Moreover, cross-examination further revealed that West Orange's expert did not possess several comparable leases or the landlord's work letters attached to leases in his possession. Thus, the court finds West Orange's expert's testimony that the retail marketplace does not support a tenant improvement allowance less credible.

Accordingly, the court accepts Plaza's expert's concluded $1.00 per square foot, per year, expense for tenant improvement allowances. However, the court highlights that no testimony was offered during trial with respect to the tenant improvement allowance that would be afforded to






the 102,912 square feet of basement area or 9,139 square feet of mezzanine area. Although Plaza's expert offered credible testimony that tenant improvement allowances range from $10 to $20 per square foot for ground floor retail space, no evidence was offered regarding what, if any, tenant improvement allowance would be afforded for partially finished basement space and mezzanine space having limited, if any, retail uses. Moreover, under his reconstructed operating statement, Plaza's expert did not apply a tenant improvement allowance to the 9,139 square feet of supermarket's mezzanine area. Therefore, the court will apply the $1.00 per square foot, per year, expense for tenant improvements to the subject property's 181,028 square feet of ground floor area (293,079 – 102,912 – 9,139 = 181,028 square feet).

### 3. Capitalization

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate, at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's Net Operating Income into an estimate of value.

Here, in deriving their capitalization rates, Plaza's expert and West Orange's expert undertook a review of data, including investor surveys and published capitalization rates, but primarily relied on the Band of Investment technique.[34] The Band of Investment technique "is a

---

[34] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J. Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a






form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10ᵗʰ ed 1992)). When employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. 265, 279-80 (1985)).

Plaza's expert consulted PWC/Korpacz Real Estate surveys, American Council of Life Insurers ("ACLI") Investment Bulletins, and RealtyRates.com to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates.

Similarly, West Orange's expert conferred with a local banking institution, and consulted American Council of Life Insurers ("ACLI") bulletins, Real Estate Research Corporation ("RERC"), and PWC/Korpacz Real Estate surveys, and Federal Reserve 10-year and 30-year treasury yields to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates.

After reviewing that data and information, Plaza's expert concluded the following capitalization rates: (i) 7.01%, as of October 1, 2013 (4.75% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate); (ii) 6.99%, as of October 1, 2014 (4.70% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate); (iii)

---

reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.






6.99%, as of October 1, 2015 (4.70% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate); (iv) 6.83%, as of October 1, 2016 (4.40% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate); (v) 7.01%, as of October 1, 2017 (4.75% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate); and (vi) 7.27%, as of October 1, 2018 (5.25% interest rate, 75% loan-to-value ratio, 25-year amortization, and 7.50% equity dividend rate).

Conversely, West Orange's expert concluded the following capitalization rates: (i) 5.95%, as of October 1, 2013 (4.00% interest rate, 75% loan-to-value ratio, 30-year amortization, and 6.69% equity dividend rate); (ii) 6.0%, as of October 1, 2014 (4.25% interest rate, 75% loan-to-value ratio, 30-year amortization, and 6.27% equity dividend rate); (iii) 5.7%, as of October 1, 2015 (4.00% interest rate, 75% loan-to-value ratio, 30-year amortization, and 5.60% equity dividend rate); (iv) 5.8%, as of October 1, 2016 (4.25% interest rate, 75% loan-to-value ratio, 30-year amortization, and 5.46% equity dividend rate); (v) 6.0%, as of October 1, 2017 (4.375% interest rate, 75% loan-to-value ratio, 30-year amortization, and 6.105% equity dividend rate); and (vi) 6.15%, as of October 1, 2018 (4.375% interest rate, 75% loan-to-value ratio, 30-year amortization, and 6.65% equity dividend rate).

The court's own review and analysis of the above information disclosed that: (i) as of the October 1, 2013 valuation date, retail property loans were 4.20% to 5.44%, and loan-to-value ratios were 49.27% to 75%; (ii) as of the October 1, 2014 valuation date, retail property loans were 4.08% to 5.88%, and loan-to-value ratios of 59.35% to 75%; (iii) as of the October 1, 2015 valuation date, retail property loans were 3.89% to 5.79%, and loan-to-value ratios of 57.93% to 75%; (iv) as of the October 1, 2016 valuation date, retail property loans were 3.50% to 5.52%, and loan-to-value






ratios were 56.25% to 75%; (v) as of the October 1, 2017 valuation date, retail property loans were 3.67% to 5.85%, and loan-to-value ratios were 56.12% to 75%; and (vi) as of the October 1, 2018 valuation date, retail property loans were 4.27% to 6.23%, and loan-to-value-ratios were 57.33% to 75%.

Thus, based on a review of the above data and information, as well as the experts' testimony and opinions, the court concludes that under the Band of Investment technique: (i) as of the October 1, 2013, October 1, 2014, October 1, 2015, and October 1, 2016 valuation dates, a mortgage interest rate of 4.375% is reasonable, Plaza's expert's proposed 25-year amortization term is reasonable, both experts' proposed 75% loan-to-value ratio is reasonable, and an equity dividend rate of 7.00%, is reasonable; and (ii) as of the October 1, 2017, and October 1, 2018 valuation dates, a mortgage interest rate of 4.75% is reasonable, Plaza's expert's 25-year amortization term is reasonable, both experts' proposed 75% loan-to-value ratio is reasonable, and an equity dividend rate of 7.25% is reasonable.

Thus, using the Band of Investment technique, the calculation of the capitalization rate as of the October 1, 2013, October 1, 2014, October 1, 2015, and October 1, 2016 valuation dates would be:

| | | | | | |
|---|---|---|---|---|---|
| Mortgage interest rate | 4.375% | | | | |
| Amortization period | 25 years | | | | |
| Mortgage constant | 6.585 | | | | |
| Mortgage component | 75% | x | 6.585 | = | 4.94 [ROUNDED] |
| Equity divided rate | 7.0% | | | | |
| Equity component | 25% | x | 7.0 | = | 1.75 |
| | | | | | 6.69% |






Thus, the court concludes that an 6.69% capitalization rate should apply to the subject property as of the October 1, 2013, October 1, 2014, October 1, 2015, and October 1, 2016 valuation dates.

**2014, 2015, 2016, and 2017 Tax Years**

INCOME:

| | | | |
|---|---|---|---|
| Upper-tier ground floor | $15.00 psf | @ 56,000 sq. ft. | $ 840,000 |
| Upper-tier basement | $ 6.00 psf | @ 102,912 sq. ft. | $ 617,472 |
| Supermarket – ground floor | $18.00 psf | @ 42,430 sq. ft. | $ 763,740 |
| Supermarket – mezzanine | $10.60 psf | @ 9,139 sq. ft. | $ 96,873 |
| Mid-Size/Big Box | $16.25 psf | @ 35,000 sq. ft. | $ 568,750 |
| In-Line/Gen. Retail/Verizon | $32.00 psf | @ 25,858 sq. ft. | $ 827,456 |
| Retro Fitness | $16.25 psf | @ 14,115 sq. ft. | $ 229,369 |
| Mavis Disc. Tire Center | $25.45 psf | @ 7,625 sq. ft. | $ 194,056 |
| TOTAL: POTENTIAL GROSS INCOME | | 293,079 sq. ft. | $4,137,716 |

LESS: Vacancy & Collection Loss @ 6.00% PGI — ($ 248,263)

TOTAL: EFFECTIVE GROSS INCOME — $3,889,453

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Leasing Commissions | @ 3.75% of EGI | $145,854 |
| Management | @ 4.0% of EGI | $155,578 |
| Repairs/Replacement Reserves | @ 2.0% of EGI | $ 77,789 |
| Tenant Improvements 181,028 sq. ft. @ $1.00 psf | | $181,028 |
| TOTAL: EXPENSES | | ($560,249) |

NET OPERATING INCOME — $ 3,329,204

TOTAL CAPITALIZATION RATE 6.69%

APPLICATION OF CAPITALIZATION RATE $3,329,204/.0669 = $49,763,886

CONCLUDED VALUE — $49,800,000

Accordingly, for the reasons set forth above, the court finds the true value of the subject property to be $49,800,000, as of the October 1, 2013, October 1, 2014, October 1, 2015, and






October 1, 2016 valuation dates.

Additionally, using the Band of Investment technique, the calculation of the capitalization

rate as of the October 1, 2017, and October 1, 2018 valuation dates would be:

| | | | | | |
|---|---|---|---|---|---|
| Mortgage interest rate | 4.75% | | | | |
| Amortization period | 25 years | | | | |
| Mortgage constant | 6.841 | | | | |
| Mortgage component | 75% | x | 6.841 | = | 5.13 [ROUNDED] |
| Equity divided rate | 7.25% | | | | |
| Equity component | 25% | x | 7.25 | = | 1.81 |
| | | | | | 6.94% |

Thus, the court concludes that an 6.94% capitalization rate should apply to the subject

property as of the October 1, 2017, and October 1, 2018 valuation dates.

**2018 and 2019 Tax Years**

INCOME:

| | | | |
|---|---|---|---|
| Upper-tier ground floor | $15.00 psf | @ 56,000 sq. ft. | $ 840,000 |
| Upper-tier basement | $ 6.00 psf | @ 102,912 sq. ft. | $ 617,472 |
| Supermarket – ground floor | $18.00 psf | @ 42,430 sq. ft. | $ 763,740 |
| Supermarket – mezzanine | $10.60 psf | @ 9,139 sq. ft. | $ 96,873 |
| Mid-Size/Big Box | $16.25 psf | @ 35,000 sq. ft. | $ 568,750 |
| In-Line/Gen. Retail/Verizon | $32.00 psf | @ 25,858 sq. ft. | $ 827,456 |
| Retro Fitness | $16.25 psf | @ 14,115 sq. ft. | $ 229,369 |
| Mavis Dis. Tire Center | $25.45 psf | @ 7,625 sq. ft. | $ 194,056 |
| TOTAL: POTENTIAL GROSS INCOME | | 293,079 sq. ft. | $4,137,716 |

| | | |
|---|---|---|
| LESS: Vacancy & Collection Loss @ 9.00% PGI | | ($ 372,394) |
| TOTAL: EFFECTIVE GROSS INCOME | | $3,765,322 |

STABILIZED EXPENSES:

| | | |
|---|---|---|
| Leasing Commissions | @ 3.75% of EGI | $141,200 |
| Management | @ 4.0% of EGI | $150,613 |
| Repairs/Replacement Reserves | @ 2.0% of EGI | $ 75,306 |
| Tenant Improvements 181,028 sq. ft. @ $1.00 psf | | $181,028 |
| TOTAL: EXPENSES | | ($548,147) |

NET OPERATING INCOME                                                $3,217,175

TOTAL CAPITALIZATION RATE 6.94%

   

APPLICATION OF CAPITALIZATION RATE   $3,217,175/.0694 =   $46,356,988

CONCLUDED VALUE                                                          $46,400,000

Accordingly, for the reasons set forth above, the court finds the true value of the subject property to be $46,400,000, as of the October 1, 2017, and October 1, 2018 valuation dates.

2.   Corrected Local Property Tax Assessment

Having reached a conclusion of the subject property's true or market value, the court will determine the correct assessments for the subject property for the 2014, 2015, 2016, 2017, 2018, and 2019 tax years. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| True market value | X | Average Ratio | = | Revised taxable value |
|---|---|---|---|---|

For the 2014 tax year, the ratio of total assessed value, $50,000,000, to true market value, $49,800,000, yields a ratio of 1.004% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the subject property's assessment calculation for the 2014 tax year is:

$49,800,000   x   .9738 =   $48,495,000 [ROUNDED]

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2014 will be entered as follows:






| Block 152.01, Lot 1445 | | Block 152.01, Lot 1445.05 | |
|---|---|---|---|
| Land | $ 7,499,900 | Land | $456,300 |
| Improvement | $40,219,200 | Improvement | $319,600 |
| Total | $47,719,100 | Total | $775,900 |

For the 2015 tax year, the ratio of total assessed value, $50,000,000, to true market value, $49,800,000, yields a ratio of 1.004% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the subject property's assessment calculation for the 2015 tax year is:

$$\$49,800,000 \quad \text{x} \quad .9722 \quad = \quad \$48,416,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2015 will be entered as follows:

| Block 152.01, Lot 1445 | | Block 152.01, Lot 1445.05 | |
|---|---|---|---|
| Land | $ 7,499,900 | Land | $456,300 |
| Improvement | $40,140,100 | Improvement | $319,700 |
| Total | $47,640,000 | Total | $776,000 |

For the 2016 tax year, the ratio of total assessed value, $50,000,000, to true market value, $49,800,000, yields a ratio of 1.004% which exceeds the upper limit of the Chapter 123 common level range. Consequently, the subject property's assessment calculation for the 2016 tax year is:

$$\$49,800,000 \quad \text{x} \quad .9390 \quad = \quad \$46,762,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2016 will be entered as follows:

| Block 152.01, Lot 1445 | | Block 152.01, Lot 1445.05 | |
|---|---|---|---|
| Land | $ 7,499,900 | Land | $456,300 |
| Improvement | $38,512,600 | Improvement | $293,200 |
| Total | $46,012,500 | Total | $749,500 |

For the 2017 tax year, the ratio of total assessed value, $50,000,000, to true market value,


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



$49,800,000, yields a ratio of 1.004% which exceeds the upper limit of the Chapter 123 common

level range. Consequently, the subject property's assessment calculation for the 2017 tax year is:

$$\$49,800,000 \quad x \quad .9250 \ = \quad \$46,065,000$$

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2017 will be entered as follows:

Block 152.01, Lot 1445                           Block 152.01, Lot 1445.05

| Land | $ 7,499,900 | Land | $456,300 |
|---|---|---|---|
| Improvement | $37,827,100 | Improvement | $281,700 |
| Total | $45,327,000 | Total | $738,000 |

For the 2018 tax year, the ratio of total assessed value, $50,000,000, to true market value,

$46,400,000, yields a ratio of 1.078% which exceeds the upper limit of the Chapter 123 common

level range. Consequently, the subject property's assessment calculation for the 2018 tax year is:

$$\$46,400,000 \quad x \quad .8981 \ = \quad \$41,672,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the local property tax assessment for the subject

property for tax year 2018 will be entered as follows:

Block 152.01, Lot 1445                           Block 152.01, Lot 1445.05

| Land | $ 7,499,900 | Land | $456,300 |
|---|---|---|---|
| Improvement | $33,504,700 | Improvement | $211,100 |
| Total | $41,004,600 | Total | $667,400 |

For the 2019 tax year, the ratio of total assessed value, $50,000,000, to true market value,

$46,400,000, yields a ratio of 1.078% which exceeds the upper limit of the Chapter 123 common

 

level range. Consequently, the subject property's assessment calculation for the 2019 tax year is:

$$\$46,400,000 \quad x \quad .8774 \quad = \quad \$40,711,000 \text{ [ROUNDED]}$$

Accordingly, a judgment establishing the local property tax assessment for the subject property for tax year 2019 will be entered as follows:

Block 152.01, Lot 1445

| | |
|---|---|
| Land | $ 7,499,900 |
| Improvement | $32,559,100 |
| Total | $40,059,000 |

Block 152.01, Lot 1445.05

| | |
|---|---|
| Land | $456,300 |
| Improvement | $195,700 |
| Total | $652,000 |

Contemporaneously with the issuance of this opinion, the court is entering the above-referenced judgments.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

